IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

AVANTI WIND SYSTEMS, INC.,     )
     )     CIVIL ACTION NO. 3:14-98
     Plaintiff,     )
     )     JUDGE KIM R. GIBSON
     v.     )
     )
ROBERT N. SHATTELL and THE     )
TEMPEST GROUP, INC.,     )
     )
     Defendants.     )

## MEMORANDUM OPINION AND ORDER

## I.    Introduction

This action arises from a former employment relationship between Defendant Robert N. Shattell and Plaintiff Avanti Wind Systems, Inc. Pending before the Court is Defendants' Motion for Summary Judgment (ECF No. 55), which seeks judgment as a matter of law pursuant to Federal Rule of Civil Procedure 56 as to all claims asserted in the complaint filed on April 15, 2014, in the Court of Common Pleas of Cambria County, and removed to this Court on May 15, 2014. (ECF No. 1.) The complaint asserts claims for misappropriation of trade secrets, unfair competition, injunctive relief, unjust enrichment, interference with business relationship, and conversion. (ECF No. 1-2.) Also pending before the Court is Plaintiff's Motion to Strike Portions of Defendants' Reply Brief in Support of Motion for Summary Judgment, filed on November 13, 2015. (ECF No. 64.) These matters have been fully briefed (*see* ECF Nos. 54, 56, 59, 60, 62, 64, 65), and are now ripe for disposition. For the reasons that follow, Defendants' motion for summary judgment is **DENIED**, and Plaintiff's motion to strike portions of Defendants' reply brief is **DENIED AS MOOT.**

## II.     Jurisdiction and Venue

The Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332, because the parties are of diverse citizenship and the amount in controversy exceeds $75,000. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1441(a).

## III.    Background

Avanti Wind Systems, Inc. is a multi-national corporation that manufactures ladder systems, service lifts, and climb assists. (ECF No. 56 ¶¶ 330-31.) Avanti also provides service and training to its customers. (Id. ¶ 332.) Kent Pedersen is Avanti North America's general manager. (Id. ¶ 333.)

### A.  Robert Shattell's Employment at Avanti

Mr. Shattell worked at Avanti as both a field technician and later as a key accounts manager. (Id. ¶¶ 24, 34.) Prior to joining Avanti, Mr. Shattell had received first aid, CPR training, and OSHA certificates through "wind school," but had no prior experience working in the wind industry. (Id. ¶ 26; ECF No. 60 (Plaintiff's Supplemental Material Facts (Pl. SMF)) ¶ 1.) While working at Avanti, Mr. Shattell learned a great deal about Avanti's business. (ECF No. 60 (Pl. SMF) ¶ 2.)

When he was hired, and again in 2013, Mr. Shattell received an Employee Handbook which provided him with instructions regarding the use of Avanti's confidential information. (Id. ¶ 4.) Specifically, the Handbook notifies employees that they will work with or have access to Avanti's confidential information during their employment, including "customer and client data, blueprints, production techniques, financial data, sales and marketing activity and plans, trade secrets, proposals, contracts, and any other information Avanti tries to keep confidential."

(ECF No. 60 (Pl. SMF) ¶ 5.) The Handbook also reminds employees that they "have an obligation to maintain the confidentiality of this information." (Id. ¶ 6.) The Handbook provides that "[e]mployees are expected to maintain the confidentiality of Avanti's confidential information after their employment ends, for whatever reason" and also instructs employees "to return all confidential information including any copies or files you have created on personal devices" at the end of the employment relationship. (Id. ¶¶ 7-8.) Mr. Shattell signed an acknowledgment form each time he received the Handbook, recognizing that he had received and understood it. (Id. ¶ 9.) The Handbook states that it does not create contractual obligations, but provides specific instruction regarding the use of Avanti's confidential information both during and after the employment relationship, and Mr. Shattell was aware when he left Avanti in April of 2013 that he was not permitted to retain any of its confidential information. (ECF No. 56 ¶ 346; ECF No. 60 ¶¶ 132, 347.)

As a field technician, Mr. Shattell was responsible for troubleshooting, providing service, certifying the equipment pursuant to Avanti specifications, and training the customer's operations and maintenance technicians on proper use of Avanti equipment. (ECF No. 56 ¶ 25.) During his time as a field technician, Mr. Shattell was provided with training on the maintenance, service, and certification of Avanti's equipment, was given access to proprietary documents and information, and was provided with confidential information about Avanti's customer base. (ECF No. 60 (Pl. SMF) ¶ 3.) Mr. Shattell also had access to other confidential information which included blueprints and drawings that were not publicly available. At times, Mr. Shattell used his personal email account for Avanti business, as well as the personal email accounts for other field technicians. (ECF No. 56 ¶¶ 28-31.) In addition, because Avanti did not

3

provide Mr. Shattell with a computer when he worked as a field technician, Mr. Shattell used his own personal computer. (*Id.* ¶ 32.)

In 2012, Kent Pedersen, General Manager of Avanti North America, promoted Mr. Shattell to Key Accounts Manager. (*Id.* ¶ 34.) As Key Accounts Manager, Mr. Shattell was responsible for sales to and support of many of Avanti's most significant customers. (ECF No. 60 (Pl. SMF) ¶ 12.) He was provided access to additional trade secret information, including Avanti's pricing structure and competitive strategies, and information about Avanti's customers that was not generally known and which Avanti had compiled through great effort and over a long period of time. (*Id.* ¶ 13.) In this new role, Mr. Shattell was given an Avanti laptop and began using his Avanti email. (ECF No. 56 ¶¶ 35-36.)

In late November or early December of 2012, however, after he had spent several months as Key Accounts Manager, Mr. Shattell was asked to move back into the field. This change in position was due to reasons unrelated to Mr. Shattell's performance, including Avanti's prediction that its revenue would decrease substantially in 2013. (*Id.* ¶¶ 37-39; ECF No. 60 (Pl. SMF) ¶ 14.) This transition represented a significant pay cut for Mr. Shattell. (ECF No. 56 ¶ 40.) Mr. Shattell returned the Avanti laptop at this time, and resumed using his personal email address for Avanti business, except to communicate with customers. (*Id.* ¶¶ 41-42; ECF No. 60 ¶ 42.) The parties dispute whether Mr. Shattell maintained any of his responsibilities as Key Accounts Manager when he returned to the field. (ECF No. 56 ¶ 44; ECF No. 60 ¶ 44.)

**B. The Tempest Group**

Cynthia Cuenin formed Cuenin Elevator in November 2012. (ECF No. 56 ¶¶ 84, 211.) Originally, Ms. Cuenin intended that her husband, David Smith, would do the work for Cuenin Elevators, because he is a Qualified Elevator Inspector. (*Id.* ¶ 212.) When Ms. Cuenin learned about wind turbine elevators, she looked into whether she could develop work in that industry, and learned that the industry was in the process of adopting an elevator/escalator code. (*Id.* ¶ 213.) In the process of starting the company, Ms. Cuenin reached out to individuals at the Work Preservation Fund to get contact information for potential customers. (*Id.* ¶¶ 86, 217.) Originally, Ms. Cuenin wanted to work with manufacturers of elevators; one of the manufacturers with whom Ms. Cuenin wanted to get in touch was Avanti. (*Id.* ¶¶ 87-88, 218.) Ms. Cuenin was also given the names of other elevator companies in the wind industry, including Hilo, Gorecon, and Power Climber. (*Id.* ¶ 222.)

Ms. Cuenin wanted to be trained on Avanti's equipment, and wrote to Avanti asking to be trained and certified on its equipment. (*Id.* ¶¶ 90, 92.) On November 27, 2012, Ms. Cuenin called Avanti and spoke to Mike Hobbs, who was then the general manager of operations at Avanti North America, and he referred Ms. Cuenin to speak to Mr. Shattell. (*Id.* ¶ 89-91.) Mr. Shattell spoke to Ms. Cuenin about one hour later on November 27, 2012, and was impressed by her business model. (*Id.* ¶¶ 93-94, 229.) During this initial conversation, Mr. Shattell believed that Ms. Cuenin was interested in wind turbines themselves, while Mr. Shattell was more interested in state inspections, and Mr. Shattell believed that Ms. Cuenin had recognized a niche in the wind industry. (*Id.* ¶¶ 93-96.)

The parties dispute whether there was overlap between Avanti's services and the plans for Ms. Cuenin's business. Defendants state that Avanti did not perform any type of maintenance work on turbines, and that Mr. Shattell believed that the state certification business in which he was interested would not compete with Avanti because Avanti cannot certify elevators. (*Id.* ¶¶ 98-99.) Plaintiff, on the other hand, cites facts indicating that Tempest's "Compliance Assessment" and pre-inspection business competes with Avanti's Recertification business. (ECF No. 60 ¶99.) There is no dispute, however, that once Tempest was actually formed, it competed directly with Avanti by providing inspection and maintenance services for Avanti's lifts. (ECF No. 60 (Pl. SMF) ¶ 19.) There is also no dispute that prior to Mr. Shattell joining Tempest, Ms. Cuenin was not able to obtain a single client. (*Id.* ¶ 31; ECF No. 62-1 ¶ 31.)

Mr. Shattell continued to speak to Ms. Cuenin about her business and made an effort within Avanti to get the company to use or partner with Cuenin Elevator. (ECF No. 56 ¶¶ 102-03.) Specifically, Mr. Shattell spoke to Andy Van Slett, the Global Director of Service for Avanti, and told Mr. Van Slett that he was impressed with Ms. Cuenin and that he believed that her business might be a useful tool for Avanti state inspections. Mr. Shattell told Mr. Van Slett that he believed Ms. Cuenin's company would not be in competition with Avanti because Avanti would not be able to do state certifications (*Id.* ¶¶ 104, 106, 329.) Mr. Van Slett was not interested in pursuing a relationship with Ms. Cuenin's business, and he said that Avanti would not "train people to do [its] job." (*Id.* ¶¶ 105, 125.) Mr. Shattell then gave Ms. Cuenin the names of individuals in the industry to whom she could reach out regarding her business. (*Id.* ¶ 107.)

As early as December of 2012, Mr. Shattell began providing Ms. Cuenin with what he, in an email to Ms. Cuenin, called "inside information" about Avanti's customer base and the key

contacts who could send business to Tempest, though there is a dispute as to whether the reference to "inside information" was meant as a joke. (ECF No. 60 (Pl. SMF) ¶ 21; ECF No. 62-1 ¶ 21.)

At or near the same time, Mr. Shattell sent to his personal email address copies of Avanti's business information, including Avanti's Customer List, two customer quotes, and Avanti's Work Method Statement, which was a comprehensive procedure developed by Avanti and used by its technicians to inspect its lifts. (ECF No. 60 (Pl. SMF) ¶ 22.) These emails and their contents will be discussed in more detail below.

Ms. Cuenin and Mr. Shattell began discussions about going into business together sometime in December of 2012. (ECF No. 56 ¶¶ 126, 233.) Mr. Shattell did not tell any of his supervisors from Avanti that he planned to go into business with Ms. Cuenin. (ECF No. 60 (Pl. SMF) ¶ 20.) While still employed by Avanti, Mr. Shattell assisted Ms. Cuenin in developing Tempest's website (ECF No. 56 ¶ 129), and in late December of 2012, Ms. Cuenin and Mr. Shattell met in person along with Dave Smith, Ms. Cuenin's husband and the qualified elevator inspector for Tempest. (Id. ¶¶ 101, 108.) The three met to discuss going into business together, and at this point, Ms. Cuenin and Mr. Smith had decided that they wanted to do more than only inspections, because the elevator equipment in wind turbines is basic elevator equipment. (Id. ¶ 235.)

The parties dispute Mr. Shattell's intentions at this point. Defendants state that Ms. Cuenin and Mr. Smith disagreed with Mr. Shattell because Mr. Shattell wanted to focus the business on third party inspections and the compliance end of the business, and thought it was a bad idea to do service and maintenance. (Id. ¶¶ 108, 236.) Defendants cite facts indicating that

Mr. Shattell believed that the way into the industry was through state inspections, and believed that the manufacturers had saturated the industry with respect to lift services. (*Id.* ¶¶ 109-10.) Moreover, Defendants cite Mr. Shattell's testimony stating his belief that there was not enough money to try to get into the lift service side of the business. (*Id.* ¶ 111.) Plaintiff, however, cites evidence indicating that Mr. Shattell did not believe that the way into the industry was through state inspections, because today, Tempest only performs recertification, service, and maintenance services, and has not performed any third party inspections. (ECF No. 60 ¶ 109, 236.) Plaintiff also cites evidence that Mr. Shattell did not believe that the manufacturers had saturated the industry with respect to lift services, because Tempest performs the same lift services as Avanti. (*Id.* ¶ 110.) Lastly, Plaintiff cites evidence that Mr. Shattell did not believe that there was not enough money to get into the lift service end of the business, because Tempest did get into that business. (*Id.* ¶ 111.)

Nevertheless, there is no dispute that by January 3, 2013, Ms. Cuenin and Mr. Shattell had engaged in discussions about Mr. Shattell joining Ms. Cuenin's company, and about Mr. Shattell taking an ownership interest in that company. (ECF No. 56 ¶ 112; ECF No. 60 ¶ 112.)

Again, however, the parties dispute whether, when Mr. Shattell agreed to take an ownership interest in the company, he knew that the company he was joining would compete with Avanti. Defendants cite evidence that Mr. Shattell was not concerned about these communications with Ms. Cuenin or about his plans to go into business with her in late December 2012 and early January 2013, because he did not believe that the new company would compete with Avanti. (ECF No. 56 ¶ 113.) Defendants cite evidence that Mr. Shattell believed that the new company would (and should) be strictly focused on doing state inspections and

consulting, writing variances, and working with turbine manufacturers and original equipment manufacturers of elevators to help them have compliant elevators in different jurisdictions. (*Id.* ¶ 114.) Plaintiff, however, states that Mr. Shattell's alleged belief that the new company would not compete with Avanti is belied by the fact that Tempest is now in direct competition with Avanti's service and inspection business. (ECF No. 60 ¶¶ 113-14.) Defendants concede that once Mr. Shattell learned that Avanti was not interested in cooperating with Tempest, Mr. Shattell agreed with Ms. Cuenin that Tempest should pursue services in addition to compliance assessments and inspections. (ECF No. 56 ¶ 263-64.) Plaintiff notes that Tempest's initial proposal included both service and inspection work. (ECF No. 60 ¶ 264.)

Ms. Cuenin officially founded Tempest in February 2013. At this time, Ms. Cuenin was the sole shareholder and Mr. Shattell was not an owner or employee (ECF No. 56 ¶¶ 127-28, 253-54), but Mr. Shattell did receive a 15% share in the company for the work he would be doing. (*Id.* ¶ 256.) Defendants state that Mr. Shattell did not do any work on a business level for Tempest before leaving his employment at Avanti, but Plaintiff disputes this fact, stating that Mr. Shattell consulted with Ms. Cuenin on the development of Tempest's website, consulted with Ms. Cuenin on marketing and the Tempest logo, and gave Ms. Cuenin contact information for several potential customers, all while still working at Avanti. (*Id.* ¶ 273; ECF No. 60 ¶ 273.)

Mr. Shattell resigned from his position at Avanti in April of 2013, and worked for Sears as a repair technician on appliances. (ECF No. 56 ¶ 119.) While working at Sears, Mr. Shattell also worked to help set up Tempest. (*Id.* ¶ 122.) Mr. Shattell, Ms. Cuenin, and Mr. Smith worked on creating Tempest's procedures, checklists, PowerPoint presentations, and a maintenance control program. (*Id.* ¶ 135.) Mr. Shattell provided some of the information in the checklists, but

Defendants cite evidence indicating that Mr. Smith provided most of the information that was included in the checklists, procedures, and maintenance control program. (*Id.* ¶¶ 136-37.) Plaintiff disputes this fact to the extent it suggests that Tempest's materials were not based on Avanti's materials, citing testimony about the similarities between Avanti's and Tempest's documents. (ECF No. 60 ¶ 136.) Mr. Shattell also began reaching out to friends and acquaintances at wind farms in Pennsylvania to solicit business for Tempest at this time. (ECF No. 56 ¶ 144.) Mr. Shattell and Ms. Cuenin made "cold calls" to many wind farms, some of which were Avanti customers. (*Id.* ¶ 145.) The parties cite conflicting evidence as to whether Mr. Shattell used Avanti's confidential information, including the Customer List, to solicit business for Tempest. (ECF No. 56 ¶¶ 146-50; ECF No. 60 ¶¶ 146-50.) Mr. Shattell worked for Sears until April of 2014, and began receiving payment from Tempest in 2014. (ECF No. 56 ¶¶ 120-21.)

The parties dispute the amount of overlap between the businesses of Tempest and Avanti. Defendants state that Avanti does not provide compliance assessments, during which information is gathered on the make of an elevator and the jurisdiction in which it is located and the relevant code and regulations for that jurisdiction are applied to identify any deficiencies, while Plaintiff states that Avanti does provide compliance assessments. (*Id.* ¶¶ 182-83; ECF No. 60 ¶ 182.)

There is no dispute that today, Tempest performs services and repairs and is in direct competition with Avanti. (ECF No. 56 ¶ 115; ECF No. 60 ¶ 115.)

### C. The Robert Shattell Emails and Avanti's Claimed Confidential Information

Shortly after learning that he would return to the field after having been promoted to the position of Key Accounts Manager, Mr. Shattell sent four emails from his Avanti email account to his personal email account. Three of these emails were sent following Mr. Shattell's first telephone conversation with Ms. Cuenin, which took place on November 27, 2012. Each of these emails included attachments, and Avanti claims that many of these attachments contained its confidential trade secret information. (ECF No. 56 ¶¶ 47-48.)

On November 26, 2012, Mr. Shattell sent an email from his Avanti email address to his personal email address that included an attached document called "Lift locations and Contacts.xlsx" (the **Customer List**). (*Id.* ¶¶ 50-51.) The Customer list includes information about Avanti's customers, lift locations, contacts at wind farms, contact information for customers, addresses, recertification months, and revenue information. (*Id.* ¶ 52.) Mr. Shattell understood that the pricing information that he received while working as a key accounts manager was confidential information, but the parties dispute whether Mr. Shattell knew that the contact information for the site managers and the list of supervisors at the wind farms was also considered confidential by Avanti. Defendants cite facts indicating that Mr. Shattell did not believe the contact information for the site managers was confidential and that the list of supervisors kept by Avanti was outdated, but Plaintiff cites facts showing that Mr. Shattell had received Avanti's Employee Handbook which stated that, among other things, Avanti's "customer information and client data" are confidential. (*Id.* ¶¶ 53-55; ECF No. 60 ¶ 54.) Mr. Shattell also testified that he would not have emailed the Customer List to a competitor if he had been asked to do so. (*Id.* ¶ 54.) In addition, Mr. Shattell stated that he could have asked

someone in the office for the contact information included in the Customer List if he had needed it. (ECF No. 60 (Pl. SMF) ¶ 25.)

On November 29, 2012, Mr. Shattell sent another email from his Avanti email address to his personal email address, to which he attached the following documents: Robert Shattell Safety document, a Siemens document, a First Aid document, and a lift cage training document. (ECF No. 56 ¶ 57.) Of these documents, the parties agree that the safety document, the Siemens document, and the first aid document are not trade secrets, confidential, or proprietary information. (ECF No. 56 ¶ 58; ECF No. 60 ¶ 58.)

On December 3, 2012, Mr. Shattell sent another email from his Avanti email address to his personal email address, which contained a series of emails between Mr. Taylor and Scott Dodge of Nextera (a developer of wind farms and an owner and operator of wind farms). (ECF No. 56 ¶¶ 62, 350.) These emails contained two quotations: the Crystal Lake Quote and the Endeavor Quote. (Id. ¶ 62.) The parties dispute the reason for which Mr. Shattell sent this email, and whether these quotations were subject to change. Defendants cite Mr. Shattell's testimony that he sent these quotes to himself because he was going to stay involved in soliciting work from the client on these two sites, and also cite facts indicating that the quotes in this email were subject to change. (Id. ¶¶ 63-64.) Plaintiff, on the other hand, cites facts indicating that these quotes were not subject to change and Mr. Shattell had sent final proposals to these same customers more than two weeks earlier. Moreover, Plaintiff cites facts indicating that Mr. Shattell did not maintain any of his responsibilities as Key Accounts Manager when he returned to the field, and that Mr. Shattell was aware of Avanti's pricing in his solicitations after leaving Avanti. (ECF No. 60 ¶¶ 63-65.)

Lastly, on December 4, 2012, Mr. Shattell sent an email from his Avanti email address to his personal email address to which he attached the Work Method Statement and an Avanti certification document. (ECF No. 56 ¶¶ 66-67.) The parties cite conflicting evidence as to the extent to which the Work Method Statement is used by Avanti, and whether the Work Method Statement and Checklist are confidential documents. (*Id*. ¶¶ 69-76; ECF No. 60 ¶¶ 70-76.) Mr. Shattell testified that he could have gotten a copy of the Work Method Statement from someone in the office if he had needed it. (ECF No. 60 (Pl. SMF) ¶ 23.)

Mr. Shattell was aware that when he left Avanti, he was not permitted to retain any of its confidential information. (ECF No. 56 ¶ 77.) The parties dispute, however, whether Ms. Cuenin and Mr. Smith ever saw any non-public Avanti documents prior to the discovery phase of this law suit and whether Mr. Shattell properly deleted Avanti emails and files off of his personal computer after leaving Avanti. Mr. Shattell testified that he did so within several weeks of leaving Avanti, and that the four emails, along with the relevant attachments, were permanently deleted from his personal email account sometime in the spring of 2013.

Plaintiff disputes these facts, and cites evidence that all of Tempest's customers appear on Avanti's Customer List, that Tempest intentionally undercut Avanti on price, and that Tempest created its own documents using Avanti's documents. (ECF No. 56 ¶¶ 78-79, 82-83, 139-41; ECF No. 60 ¶¶ 78-79, 82-83, 139-41.) The next three subsections will outline the relevant facts related to each of these three categories of Avanti's claimed confidential information.

### 1. Customer Information

Avanti considers the Customer List to be a trade secret, and requires employees to sign its Employee Handbook, which describes Avanti's confidential information, including customer information, and instructs that it not be disclosed outside of the company. (*Id.* ¶ 285.)

Avanti has cited facts supporting the difficulty of creating such a list. There are approximately 25,000 wind turbine towers in the United States, of which approximately 3,000 have Avanti lifts. (ECF No. 56 ¶ 309; ECF No. 60 ¶ 309.) Not all wind farms have lifts. (ECF No. 60 (Pl. SMF) ¶ 28.) Avanti does not service all of its own lifts. (ECF No. 56 ¶ 310.) Not all operators of wind farm turbines are located at the wind farm, and there is no centralized directory which lists the names of wind farm site supervisors. Nor is there a directory which lists which wind farms have Avanti lifts in their turbines. Thus, without using Avanti's information as to these matters, the only way to determine which farms use Avanti lifts would be to ask each individual wind farm's operator. (ECF No. 60 (Pl. SMF) ¶¶ 26-27, 29-30.) Business transactions with Avanti's customers are accomplished through quotations and purchase orders. (ECF No. 56 ¶ 297.) Avanti's corporate documents are stored on a server which is password protected. (ECF No. 60 ¶ 284.)

The parties dispute the value of Avanti's Customer List. (*See* ECF No. 56 ¶¶ 314-17; ECF No. 60 ¶¶ 314-17.) Craig Taylor, employed by Avanti in services/sales, testified that the List was old at the time of his deposition, but that the list included valuable information, including customer information and the locations of Avanti's lifts. (*Id.* ¶¶ 283, 314-17.) In addition, Mr. Shattell testified that he would not have emailed the customer list to a competitor if he had been asked to do so. (*Id.* ¶ 317.) All of the wind farms that Tempest allegedly took from Avanti

appear on the Customer List, including current contact information for at least three of the farms' operators. (ECF No. 60 ¶ 345.) Defendants note, however, that the Customer List either did not include any contact information, or included inaccurate contact information for two of the wind farms to whom Mr. Shattell sent a proposal in the summer of 2013: Chesnut Flats and Sandy Ridge. (ECF No. 56 ¶ 363.)

When Mr. Shattell joined Tempest, Mr. Shattell and Ms. Cuenin shared the marketing efforts for Tempest, and came up with a list of companies to contact for business by looking up wind farms and doing research, and by asking questions about types of elevators and neighboring wind farms. (Id. ¶¶ 169-70.) When Mr. Shattell spoke to potential customers hoping to make a sale, he spoke about his experience in the wind industry, and about Ms. Cuenin's experience in the elevator industry. (Id. ¶ 172.)

Iberdrola is the owner of wind farms. (Id. ¶ 341.) Gamesa is a turbine manufacturer, and the elevator is built into the turbine manufacturer's tower configuration. (Id. ¶ 342.) Thus, Gamesa manufactures the turbine and Iberdrola owns and operates the wind farms. (Id. ¶ 343.) While still working at Avanti, Mr. Shattell provided Ms. Cuenin with contacts in the wind industry, including contacts at Gamesa and Iberdrola. (Id. ¶¶ 130, 238.) The parties dispute both the purpose and usefulness of these contacts. Defendants cite testimony indicating that although Mr. Shattell gave Ms. Cuenin the name of wind farm contacts, these contacts did not result in Ms. Cuenin getting any customers, and that Mr. Shattell believed that Ms. Cuenin could have gotten the contact information for Gamesa on her own. (Id. ¶¶ 117-18.) Plaintiff disputes these facts, and states that both Gamesa and Iberdrola are customers of Tempest. (ECF No. 60 ¶¶ 117, 238.) Tim Dreby of Gamesa told Mr. Taylor that Tempest was soliciting Gamesa's

business, and Gamesa has used Tempest's pricing as a negotiation tool against Avanti. (ECF No. 56 ¶¶ 307-08.) Further, Plaintiff cites evidence that Mr. Shattell acknowledged his receipt of the Avanti employee handbook, which stated that Avanti's Customer List, and the information contained therein, was confidential. (ECF No. 60 ¶ 118.)

The parties also dispute the extent to which Mr. Shattell developed personal relationships with any Avanti customers, and whether he maintained their contact information for a business purpose or for a personal purpose after he left Avanti. (ECF No. 56 ¶¶ 155-158; ECF No. 60 ¶¶ 155-158.) Mr. Shattell maintained contact information for individuals including Adam Hazenstab, Bobby Hazenstab, Anthony Rodriguez, Jimmy Brokenshire, and Don Molner. (ECF No. 56 ¶¶ 157-58.) Defendants claim that Mr. Shattell maintained these contacts because he had formed personal relationships with these individuals. Bobby Hazenstab is at the Chestnut Flats site for EDFR, which is now a client of Tempest, and Jimmy Brokenshire is the contact for Duke Energy at the Allegheny North Wind Farm. (*Id*. ¶¶ 149-60, 162, 295.) Mr. Shattell spoke to Bobby Hazenstab about leaving Avanti and setting up a new business on the day before his last day at Avanti. (*Id*. ¶¶ 159, 295.) EDFR sent Avanti purchase orders to perform services at Chestnut Flats. (ECF No. 60 ¶ 294.) Plaintiff disputes whether the individuals for whom Mr. Shattell maintained contact information were Mr. Shattell's close friends, and Plaintiff notes that Bobby Hazenstab did not have Mr. Shattell's personal cell phone number at the time Mr. Shattell resigned from his employment at Avanti. (*Id*. ¶ 157.) Plaintiff also notes that Mr. Shattell maintained contact information for at least one other individual with whom he was not a close personal friend: Joy Dong from Goldwind. (*Id*. ¶ 157.)

In July of 2013, Tempest made a proposal to five wind farms: Allegheny North, Allegheny Ridge, Sandy Ridge, Chesnut Flats, and Locust Ridge. (ECF No. 56 ¶ 164.) All of these wind farms are located in Pennsylvania, and the proposal to these companies was called the "Pennsylvania Wind Farm Co-Op Proposal" (the **Co-Op Proposal**) (*Id.* ¶ 165.) Mr. Shattell knew that these five wind farms used Avanti lifts and were in close proximity, and also knew that the operators of these wind farms had purchased maintenance and inspection services from Avanti in the past. (ECF No. 60 (Pl. SMF) ¶ 36.) Mr. Shattell had previously done a proposal to service Power Climber Lifts, which is a separate company that is not affiliated with Avanti, and had also solicited business from a company named Enel. (ECF No. 56 ¶¶ 166-68.) The parties dispute whether all of the companies Mr. Shattell solicited were companies that he did not deal with while at Avanti, or whether he solicited both customers that he dealt with while employed by Avanti as well as others that he did not encounter while employed by Avanti. (*Id.* ¶ 171; ECF No. 60 ¶ 171.) The parties also dispute whether the Co-Op Proposal included services offered by Tempest that differed from services that Avanti would have been able to offer. (ECF No. 60 (Pl. SMF) ¶ 35; ECF No. 62-1 ¶ 35.)

On July 6, 2013, Mr. Shattell sent an email to Miguel Posada at Gamesa Corporation to try to get business from Gamesa. (ECF No. 56 ¶ 173.) The parties dispute whether Mr. Shattell was trying to get only business that Avanti was not qualified to do, or whether he was also hoping to do other work that Avanti was qualified to do for Gamesa. (*Id.* ¶ 173; ECF No. 60 ¶ 173.) Plaintiff notes that in the email, Mr. Shattell included a link to Tempest's website that contained information regarding all of Tempest's services, not just those services that Avanti was not qualified to do. (*Id.* ¶ 173.)

On July 22, 2013, Mr. Shattell also sent an email to Bobby Hazenstab, Jimmy Brokenshire, and Lee Van Horn about the Co-Op Proposal. (ECF No. 56 ¶ 174.) Mr. Shattell did not have the contact information for all of the businesses to whom he was offering the Co-Op Proposal, and asked Jimmy Brokenshire and Bobby Hazenstab to forward the information to other companies. (Id. ¶ 181.)

Avanti acquires customers through purchase orders, and there is no assurance that Avanti is automatically going to be chosen to provide services for the following year. (Id. ¶ 281.) Defendants state that Avanti never had a service contract for the Chesnut Flats, Pennsylvania wind farm owned by EDFR and managed by Bobby Hazenstab, but Plaintiff disputes this fact and states that EDFR sent Avanti purchase orders to perform services at Chesnut Flats. (Id. ¶ 277; ECF No. 60 ¶ 277.) It is undisputed that Avanti did not service any lifts for EDFR in the United States in 2014, but the parties dispute whether Avanti contacted EDFR regarding its annual lift recertification business in 2014. (ECF No. 56 ¶¶ 280-81; ECF No. 60 ¶¶ 280-81.) Plaintiff states that when Mr. Taylor contacted Gamesa regarding recertification in 2014, he was told that Gamesa was not responsible for the recertification of EDFR's lifts in 2014. (Id. ¶ 300.) Mr. Taylor stated that there was no need to follow up with EDFR, because Mr. Taylor already knew that Tempest was servicing and inspecting the lifts at Chesnut Flats in 2014. (Id. ¶¶ 280, 301.)

In addition, when Mr. Van Slett was negotiating with Jim Brokenshire at Duke Energy with regard to 2014 recertification, he was notified by Duke Energy that Tempest was recertifying its lifts in 2014. (ECF No. 56 ¶ 302; ECF No. 60 ¶ 302.) Mr. Brokenshire told Mr. Van

Slett that he chose Tempest over Avanti because Tempest offered a lower price. (ECF No. 60 (Pl. SMF) ¶ 43.)

As of 2014, Avanti did not have a contract with Iberdrola, but the parties dispute whether Iberdrola was a customer of Avanti at that time. (ECF No. 56 ¶ 311; ECF No. 60 ¶ 311.) Avanti did have purchase orders with Iberdrola as of November 10, 2014. (ECF No. 56 ¶ 312; ECF No. 60 ¶ 312.) Mr. Taylor was responsible for trying to get Iberdrola's business on a yearly basis as of November 2014. (ECF No. 56 ¶ 313.) Iberdrola intended to competitively bid its fleet recertifications for 2014, and invited both Tempest and Avanti to submit bids. (Id. ¶ 389.) When Avanti learned that Tempest was also competing for Iberdrola's business, Avanti discussed with Iberdrola what it could do to maintain Iberdrola's business. (Id. ¶ 390.) Defendants state that Avanti could "only go so low" in its bid to Iberdrola because of its overhead and its need for affair margin, but Plaintiff disputes these facts and states that the reason Tempest's overhead costs were lower is because it relied on Avanti's research and development and because Tempest was aware of Avanti's pricing. (Id. ¶¶ 391-93; ECF No. 60 ¶¶ 391-93.) The parties dispute whether Tempest did any work for Iberdrola during the 2014 calendar year. (ECF No. 56 ¶ 388; ECF No. 60 ¶ 388.) Plaintiff states that Tempest submitted a proposal to perform maintenance and annual certifications for Iberdrola in 2014. (Id. ¶ 388.)

### 2. Quotes and Pricing Information

Defendants state that Ms. Cuenin is in charge of the financial part of the business and determines pricing on jobs, but Plaintiff disputes this fact and states that Mr. Shattell also had input into Tempest's pricing and advised Tempest that it should lower its pricing. (ECF No. 56 ¶ 268; ECF No. 60 ¶ 268.) It is undisputed that Ms. Cuenin wanted to charge more for Tempest's

services until Mr. Shattell told her that Tempest needed to lower its prices. (ECF No. 60 (Pl. SMF) ¶ 38; ECF No. 62-1 ¶ 38.)

The parties dispute whether Mr. Shattell knew the pricing for the Co-Op clients when he sent the Co-Op Proposal. Defendants state that when Mr. Shattell sent the Proposal, he did not know what Avanti's pricing was for these particular clients, and did not have in his possession any pricing information for the recertifications for any of these clients. (ECF No. 56 ¶¶ 175-177.) Defendants also state that Tempest learned from its customers that its prices were lower than some of the elevator manufacturers, which included Power Climber, Avanti, and Hilo. (Id. ¶¶ 184-85.)

Plaintiff, on the other hand, states that Mr. Shattell learned Avanti's pricing structure by virtue of his position as key accounts manager, and notes that Mr. Shattell acknowledged that he was aware of Avanti's pricing in his customer solicitations, in which he stated: "I think that you will find our pricing to be EXTREMELY competitive and fair."; "Our rates are more than fair and already we know much lower than some elevator manufacturers."; and "I have no doubt that we can give you . . . a cost effective alternative to what you currently have going on now." (ECF No. 60 ¶¶ 175-76, 185.) Moreover, Plaintiff notes that the quotes that Mr. Shattell emailed to his personal email address included recertifications. (Id. ¶ 177.) Plaintiff also states that Mr. Shattell advised Tempest that it should lower its pricing, and that as a result of his advice, Tempest did in fact lower its pricing. (Id. ¶¶ 246-53.)

The parties dispute the reasons for Tempest's lower overhead costs and the extent to which Mr. Shattell influenced Tempest's pricing. Defendants state that Tempest pricing is based on the International Union of Elevator Constructor's scale, and that Mr. Smith relied on his

experience in the elevator industry to determine how much time a job would require. (ECF No. 56 ¶ 246-48.) Defendants state that Ms. Cuenin collaborated with Mr. Shattell to set Tempest prices, and that Ms. Cuenin and Mr. Smith used trade standards when determining the per-unit price of inspections and certification. (*Id.* ¶¶ 250-51.) Further, Defendants state that Mr. Shattell had only minimal input into the per unit prices, and that when he did have input, Mr. Shattell tried to keep the profit margin at Tempest within 30 to 40 percent. Defendants state that Tempest's business model is different than Avanti's because its expenses and overhead were lower, due in part to the fact that Tempest sent one technician into the field instead of two technicians, and because Tempest was a much smaller organization than Avanti and Mr. Shattell was not drawing a salary. (*Id.* ¶¶ 179-80, 252.)

Plaintiff, however, notes that Tempest's Co-Op Proposal stated that it would send two people into the field, and that Tempest's overhead is lower not because of its different business model, but instead because it relied on Avanti's development and research rather than conducting its own. (ECF No. 60 ¶¶ 179-80.)

### 3.  **Corporate Documents**

Avanti's Work Method Statement is a lengthy, detailed list of processes and procedures that Avanti's technicians use to inspect lifts. (ECF No. 60 (Pl. SMF) ¶ 44.) In addition to maintenance services, Avanti also trains its customers on the maintenance and operation of its lifts. The Training Syllabus is a detailed explanation of the training to be provided during this service. (*Id.* ¶ 45.) Both the Work Method Statement and the Training Syllabus were created over the course of many years by Avanti's engineering and training departments. (*Id.* ¶ 46.) These documents undergo levels of review and approval, are revised from time to time, and are

revision controlled. (*Id.* ¶ 47.) Avanti instructs its employees not to share either of these documents with anyone outside of the company, including its customers. (*Id.* ¶ 50.) In addition, the Training Syllabus states that it is "confidential with all rights reserved for AVANTI Wind Systems A/S. It is forbidden to copy any pages from the syllabus. Copying is only allowed with a written approval from AVANTI Wind Systems A/S." (*Id.* ¶ 51). When Mr. Shattell first received the Training Syllabus, the email to which it was attached stated "All 'Avanti Training Curriculum' is confidential and should never be passed on." (*Id.* ¶ 52.)

Mr. Taylor testified that Avanti stores its corporate documents on a server which is password protected and keeps its Training Syllabus confidential by not distributing it to customers. (ECF No. 60 ¶ 284.) In addition, when Mr. Taylor gives the PowerPoint presentation to customers, he does not give any verbal instructions regarding the proprietary nature of the PowerPoint presentation. (ECF No. 56 ¶ 293.) The parties dispute whether the topics listed in Avanti's Training Syllabus are the same as those identified in Avanti's user manual, which is available on Avanti's public website. (*Id.* ¶ 382; ECF No. 60 ¶ 382.) Tempest had the Training Syllabus in its possession at the time of discovery, and Plaintiff has cited evidence that Mr. Shattell had both the Work Method Statement and the Training Syllabus in his possession even after he left Avanti, though Defendants dispute these facts. (*Id.* ¶ 359; ECF No. 60 (Pl. SMF) ¶ 48; ECF No. 62-1 ¶ 48.) The parties dispute whether Avanti's Work Method Statement is ever left with customers. (ECF No. 56 ¶ 358; ECF No. 60 ¶ 358.)

Tempest developed a Base Power Checklist for its online maintenance control program that was developed by Mr. Shattell and Mr. Smith. Tempest also used checklists provided by the state. (ECF No. 56 ¶¶ 188-89.) For Avanti's Shark Lift, Tempest uses different checklists

depending on the jurisdiction. (*Id.* ¶190.) Mr. Shattell and Mr. Smith also prepared a work process document for Tempest, which is the equivalent of Avanti's Work Method Statement. (*Id.* ¶¶191-93.) The parties dispute whether Mr. Shattell and Mr. Smith used Avanti's Work Method Statement in preparing Tempest's work process document. Defendants state that Tempest's document was prepared in reference to the American Society of Mechanical Engineers (**ASME**), and in consultation with Mr. Smith, using checklists commonly known and used in the elevator industry. (*Id.* ¶194.) Defendants also note that Mr. Shattell did not perform any inspections in compliance with the ASME standard while employed at Avanti, even if the work was performed in a jurisdiction that required ASME compliance, while at Tempest, Mr. Shattell always uses the ASME standards even if the jurisdiction has not yet adopted ASME. (*Id.* ¶¶ 195-96.) Plaintiffs, on the other hand, state that Tempest relied on Avanti's Work Method Statement in preparing its work process statement, and dispute whether Mr. Shattell applied ASME standards while working at Avanti, noting that the only facts to support Defendants' statement is the uncorroborated testimony of Mr. Shattell. (ECF No. 60 ¶ 195.)

Mr. Smith also prepared an order of operations, which is a checklist to follow prior to performing inspections in the field. (ECF No. 56 ¶ 197.) Mr. Smith was the primary author of Tempest's annual inspection checklist for the Avanti Shark. (*Id.* ¶ 198.) Tempest also prepared an OSHA annual inspection checklist for the Avanti Shark lift and a training document that Tempest provides to its customers, both of which were drafted by Mr. Smith. (*Id.* ¶¶ 201, 204.) In addition to Mr. Smith's development of the training document, the State of Pennsylvania also had input into the document, and at times, Tempest got information from the client and from site visits where necessary to develop the information fully. (*Id.* ¶¶ 204-06.) There are

differences between Avanti's Training Syllabus, and Tempest's customer presentation for training. (*Id.* ¶ 275.) In some instances, Tempest's training presentation was more detailed than Avanti's Training Syllabus. (*Id.* ¶ 383.) Tempest's training PowerPoint presentation is designed specifically to deliver to the customer and a copy of the presentation can be left with the customer. (*Id.* ¶ 276.)

Kent Pedersen testified at length regarding the similarities between Tempest's work process document and Avanti's Work Method Statement, as well as between Avanti's Training Syllabus and Tempest's training PowerPoint presentation. (ECF No. 60 (Pl. SMF) ¶ 57.)

## IV. Standard of Review

Summary judgment is appropriate only where there is no genuine dispute as to any material fact such that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Melrose, Inc. v. City of Pittsburgh*, 613 F.3d 380, 387 (3d Cir. 2010). Issues of fact are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). Material facts are those that will affect the outcome of the trial under governing law. *Anderson*, 477 U.S. at 248. The Court's role is "not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party." *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 581 (3d Cir. 2009). "In making this determination, 'a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir. 2000) (quoting *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994)).

The moving party bears the initial responsibility of stating the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets this burden, the party opposing summary judgment "'may not rest upon the mere allegations or denials of the . . . pleading,'" but "'must set forth specific facts showing that there is a genuine issue for trial.'" *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.11 (1986)). "For an issue to be genuine, the nonmovant needs to supply more than a scintilla of evidence in support of its position—there must be sufficient evidence (not mere allegations) for a reasonable jury to find for the nonmovant." *Coolspring Stone Supply, Inc. v. Am. States Life Ins. Co.*, 10 F.3d 144, 148 (3d Cir. 1993).

## V.      Discussion

### A.      Misappropriation of Trade Secrets

Plaintiff claims that Defendants violated the Pennsylvania Uniform Trade Secrets Act (**PUTSA**), 12 Pa.C.S. § 5301 *et seq.*, by using Avanti's trade secrets to solicit Avanti's customers, interfere with Avanti's contracts, and unfairly compete with Avanti in Pennsylvania. ([ECF No. 1-2 ¶¶ 40-48](#).)

Defendants move for summary judgment on this claim, making two alternative arguments. First, Defendants argue that the information that they allegedly misappropriated does not qualify as trade secret information under the PUTSA. ([ECF No. 54 at 3-15](#).) Second, and alternatively, Defendants argue that summary judgment should be granted in their favor on this claim because even if the information qualifies as trade secret information, the record

establishes that Defendants did not improperly use or disclose that trade secret information. (*Id.* at 15-22.) After outlining the relevant law, the Court will address each of these arguments in turn.

Under the PUTSA, the term "Trade Secret" is defined to mean:

Information, including a formula, drawing, pattern, compilation including a customer list, program, device, method, technique or process that:

(1)     Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

(2)     Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

12 Pa.C.S.A. § 5302. To succeed on a claim for misappropriation of trade secrets under Pennsylvania law, the plaintiff must establish (1) the existence of a trade secret (2) which was communicated in confidence to the defendant and (3) was used by the defendant in breach of that confidence (4) to the detriment of the plaintiff. *Camelot Technology, Inc. v. RadioShack Corp.*, 2003 WL 403125, at *5 (E.D. Pa. Feb. 13, 2003) (citing *Prudential Ins. Co. v. Stella*, 994 F.Supp. 318, 323 (E.D. Pa. 1998)).

The Court's threshold inquiry, then, in ruling on the instant motion for summary judgment, is to determine whether Plaintiff has set forth sufficient evidence to permit a reasonable jury to find that the information allegedly misappropriated by Defendants qualifies for trade secret status under Pennsylvania law. Assuming that Plaintiff has set forth sufficient facts on the issue of whether the information at issue qualifies as trade secret information, the Court will then address the question of whether there is sufficient evidence such that a reasonable juror could conclude that Defendants misappropriated that information.

### 1. Whether the Information at Issue Qualifies as Trade Secret Information

The question of whether information qualifies as trade secret information is "a question of fact to be resolved by the jury or the trier of fact." *Camelot Technology*, 2003 WL, at *5 (citing *Continental Data Sys., Inc. v. Exxon Corp.*, 638 F.Supp. 432, 441 (E.D. Pa. 1986)). However, factual issues may be subject to summary judgment "whenever the law as applied to uncontroverted facts shows that the movant is entitled to summary judgment." *Id*.

Plaintiffs allege that Defendants misappropriated trade secret information of the following types: (1) Avanti's customer list; (2) Avanti customer quotes; (3) Avanti pricing information; (4) Avanti training materials; (5) Avanti's installation methodologies; (6) Avanti's service methodologies; (7) Avanti's certification methodologies; and (8) Avanti's customer maintenance schedule. (ECF No. 1-2 ¶ 42.)

Pennsylvania courts refer to the factors set forth in § 757 of the Restatement of Torts to determine whether relevant information qualifies as a trade secret. These factors include: (1) the extent to which the information is known outside of the owner's business; (2) the extent to which the information is known by employees and others involved in the owner's business; (3) the extent of measures taken by the owner to guard the secrecy of the information; (4) the value of the information to the owner and to his competitors; (5) the amount of effort or money expended by the owner in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *SI Handling Sys., Inc. v. Heisley*, 753 F.2d 1244, 1256 (3d Cir. 1986) (citing Restatement of Torts § 757 cmt. b (1939)).

"The concept of a trade secret is at best a nebulous one." *Van Prods. Co. v. Gen. Welding & Fabricating Co.*, 419 Pa. 248, 213 A.2d 769, 775 (Pa. 1965). For this reason, many courts applying

Pennsylvania law determine that "[t]he question of whether certain information constitutes a trade secret is a question of fact to be resolved by the jury or the trier of fact." *Camelot Technology*, 2003 WL, at *5; *see also Bro-Tech Corp. v. Thermax, Inc.*, 651 F.Supp.2d 378, 410 (E.D. Pa. 2009). Determinations of whether information constitutes trade secret information are made on a case-by-case basis, but trade secret protection is not afforded to information that can be readily obtained from another source. *Id*. at 409.

Applying the law discussed above, the Court concludes that there are ample questions of fact such that a reasonable jury could conclude that the relevant information qualifies as trade secret information.

### a. Customer Quotations and Pricing Information

There is evidence in the record to suggest that Avanti's customer quotations and pricing information qualify as trade secrets such that a material question of fact exists on this issue. The Avanti Employee Handbook includes "financial data [and] sales and marketing activity and plans" and "proposals [and] contracts" in its definition of confidential information to which Avanti employees will have access during the course of their employment. (ECF No. 60 (Pl. SMF) ¶ 5.) By virtue of his employment as key accounts manager, Mr. Shattell learned Avanti's pricing structure, and Mr. Shattell testified that he knew that the pricing information that Avanti disclosed to him was confidential. (ECF No. 60 ¶¶ 370, 386.) Mr. Taylor testified that it stores its corporate documents on a password-protected server. (*Id*. ¶ 322.) In addition, evidence in the record indicates that Tempest considers its own pricing information to be confidential. (ECF No. 60 (Pl. SMF) ¶¶ 40, 42.) These facts would allow a reasonable juror to conclude that

Avanti's customer quotations and pricing information qualifies as trade secret information under Pennsylvania law.

### b. Maintenance Schedule, Training Materials, and Installation, Service, and Certification Methodologies

A reasonable jury could also conclude that Avanti's maintenance schedule, training materials, and installation, service, and certification methodologies qualify as trade secrets.

With regard to the amount of time required to develop these materials and the ease with which they could be duplicated, evidence in the record indicates that the Work Method Statement and the Training Syllabus were created over the course of many years by Avanti's engineering and training departments. (ECF No. 60 (Pl. SMF) ¶ 46.) Testimony in the record indicates that the Work Method Statement is a lengthy, detailed list of procedures that Avanti's technicians use to inspect lifts. Moreover, the information is valuable to Avanti because Avanti trains its customers on the maintenance and operation of its lifts using an explanation of the training to be provided that is detailed in the Training Syllabus. (*Id.* ¶¶ 44-45.)

As to the lengths to which Avanti went to keep these materials confidential, the record shows that Avanti instructs its employees to refrain from sharing these documents with anyone outside of the company, and the Training Syllabus states that it is "confidential with all rights reserved for AVANTI Wind Systems A/S" and that copying the syllabus is "forbidden" and "only allowed with a written approval from AVANTI Wind Systems A/S." (*Id.* ¶¶ 50-51.) Mr. Taylor testified that the server on which these corporate documents are stored is password protected, and that the Training Syllabus is not distributed to customers. (ECF No. 60 ¶¶ 284, 322.) More specifically, the email to which the Training Syllabus was attached when it was

originally sent to Mr. Shattell instructed that "All 'Avanti Training Curriculum' is confidential and should never be passed on." (ECF No. 60 (Pl. SMF) ¶ 52.)

The Court has little difficulty concluding that these facts would allow a reasonable jury to conclude that this category of information qualifies as trade secret information under Pennsylvania law.

### c. Customer List and Information

Pennsylvania law recognizes that customer lists may constitute trade secrets for purposes of the PUTSA; however, courts have noted that customer data is "at the very periphery of the law of unfair competition." *PNC Mortg. v. Superior Mortg. Corp.*, 2012 WL 628000, at *22 (E.D. Pa. Feb. 27, 2012) (quoting *Iron Age Corp. v. Dvorak*, 880 A.2d 657, 663 (Pa.Super.Ct. 2005) (internal quotations omitted)). Whether customer lists meet the requirements of trade secret information requires the Court to consider "(1) whether the information contained on the customer lists is obtainable in significant part; and (2) whether it is freely available without great difficulty." *PNC Mortg.*, 2012 WL, at *22 (quoting *Gen. Bus. Servs. v. Rouse*, 495 F.Supp. 526, 530 (E.D. Pa. 1980) (internal quotations omitted)).

Genuine issues of fact preclude summary judgment on the question of whether Avanti's Customer List qualifies for trade secret protection, as there are questions of material fact as to each of these two considerations.

There is conflicting evidence on the issue of whether the Customer List was confidential and whether the Customer List contained information that was valuable to Avanti. (ECF No. 56 ¶¶ 54-55, 147, 149; ECF No. 60 ¶¶ 54-55, 147, 149.) While Mr. Taylor testified that the Customer List was "old" at the time of his deposition, he stated that the list contained valuable

information, including customer information and the locations of Avanti's lifts. (ECF No. 60 ¶ 316-17.) Evidence in the record indicates that Avanti's Customer List is made available only to those employees who need it to perform their jobs. (ECF No. 60 (Pl. SMF) ¶ 56.) The Avanti Employee Handbook states that Avanti's "customer information and client data" are confidential, and Mr. Shattell testified that he would not have emailed the Customer List to a competitor if he had been asked to do so. (ECF No. 60 ¶¶ 54-55; ECF No. 60 (Pl. SMF) ¶¶ 5, 24.) There is also a genuine issue of material fact as to whether the Customer List was of any value to Tempest specifically. (ECF No. 56 ¶ 152; ECF No. 60 ¶ 152.)

In addition, the parties dispute whether the information contained on the Customer List was "freely available," or whether it would require a significant amount of work to recreate the List independently. Mr. Taylor testified that although the information on the Customer List was "old," it contained valuable information, including customer information and the locations of Avanti's lifts. (ECF No. 60 ¶ 316.) Defendants point to evidence that indicates that some of the information on the List could be found through an internet search, while Plaintiff cites conflicting testimony which suggests that the information would be difficult to locate without the List, given that there is no centralized directory listing the names of wind farm site supervisors or the wind farms that have Avanti lifts. (ECF No. 56 ¶ 154; ECF No. 60 ¶ 154) Moreover, not all wind farms have lifts, and only approximately 3,000 out of 25,000 total wind turbine towers in the United States have Avanti lifts. (ECF No. 60 (Pl. SMF) ¶¶ 26-30.) Based on the evidence, a jury could reasonably find that the Customer List qualified as trade secret information under Pennsylvania law.

## 2. Whether Defendants Misappropriated the Information

Having determined that there are material facts precluding summary judgment on the issue of whether the relevant information qualifies as trade secret information under Pennsylvania law, the Court turns now to Defendants' alternative argument, and addresses the question of whether a reasonable jury could conclude that Defendants misappropriated that information.

The PUTSA defines misappropriation as the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." 12 Pa.C.S.A. § 5302. The Act goes on to explain that misappropriation can also occur when one's trade secret is disclosed or used by a person who "at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was [either] acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use [or] derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use." *Id*.

The Court has little difficulty concluding that questions of fact preclude summary judgment on the issue of whether Defendants misappropriated Plaintiff's trade secret information. Defendants argue that Plaintiff has "no evidence that Mr. Shattell has ever used" the documents he sent to his personal email account, and which Plaintiff argues constituted trade secrets. (ECF No. 54 at 16.) Defendants argue further that Mr. Shattell had a "legitimate purpose" for sending these emails, and that Plaintiff has "no evidence" that Mr. Shattell sent himself any other information. Defendants assert that Avanti has "no evidence that Shattell ever accessed these documents either after he met [Ms.] Cuenin or after he left Avanti." (*Id*. at 17.)

The Court finds, however, that these arguments are without merit in the context of a summary judgment motion. The record is replete with evidence that would permit a reasonable jury to discredit each of these assertions, and to find instead that Defendants misappropriated Plaintiff's confidential trade secret information.

### a. Customer Quotations and Pricing Information

Facts in the record would permit a reasonable jury to conclude that Defendants misappropriated Avanti's quotes and pricing information. Mr. Shattell learned Avanti's pricing structure by virtue of his position as a Key Accounts Manager. (ECF No. 60 ¶¶ 184-85, 356, 373, 386.) Mr. Shattell testified that he was aware that the pricing information he received while working as a key accounts manager was confidential information. (ECF No. 56 ¶¶ 53, 388.) Evidence in the record indicates that Mr. Shattell sent from his Avanti email address to his personal email address a document that included Avanti quotes to two customers. (*Id.* ¶¶ 61-62, 385.)

There is a dispute of fact as to whether Mr. Shattell had input into Tempest's pricing. Plaintiff cites testimony indicating that Mr. Shattell advised Tempest that it should lower its pricing, and that, as a result of this advice, Tempest did in fact lower its pricing. (*Id.* ¶ 248; ECF No. 60 ¶¶ 248, 251-53, 268, 370.) Similarly, Ms. Cuenin testified that she had wanted to charge more for Tempest's services before Mr. Shattell told her that Tempest should lower its prices. (ECF No. 60 (Pl. SMF) ¶ 38.)

While Defendants cite testimony indicating that the quotes Mr. Shattell emailed to his personal email address were subject to change, and that Mr. Shattell did not have access to these documents while working with Ms. Cuenin, there are many facts in the record that contradict

these assertions. (ECF No. 56 ¶¶ 63-65.) Mr. Shattell sent customers final proposals of quotes that he had sent to his personal email address approximately two weeks earlier. (ECF No. 60 (Pl. SMF) ¶ 53.) Mr. Shattell also sent customer solicitations indicating that he was aware of Avanti's pricing while working for Tempest. For example, while working at Tempest, he sent emails stating: "I think that you will find our pricing to be EXTREMELY competitive and fair"; "Our rates are more than fair and already we know much lower than some elevator manufacturers"; "I have no doubt that we can give you . . . a cost effective alternative to what you currently have going on now." (ECF No. 60 ¶¶ 175-76, 184-85.) Plaintiff also cites evidence indicating that Tempest intentionally undercut Avanti on price. (*Id.* ¶¶ 82-83, 156, 348, 367-68.)

### b. Maintenance Schedule, Training Materials, and Installation, Service, and Certification Methodologies

Facts in the record would permit a reasonable jury to conclude that Defendants misappropriated Avanti's maintenance schedule, training methodologies, and installation, service, and certification methodologies.

The record indicates that Mr. Shattell sent an email from his Avanti email address to his personal email address that included Avanti's Work Method Statement and a certification document. (ECF No. 56 ¶¶ 66-67.) Mr. Shattell testified that he could have gotten a copy of the Work Method Statement from someone in the office, without emailing it to his personal account. (ECF No. 60 (Pl. SMF) ¶ 23.) Defendants cite Mr. Shattell's own testimony as support for a finding that these documents were not confidential and that Mr. Shattell did not use them while working for Tempest. (*See* ECF No. 56 ¶¶ 70-76.)

Mr. Shattell's testimony on this point, however, is contradicted by other facts in the record. Plaintiff cites evidence indicating that Avanti's Work Method Statement and Checklist were confidential documents that are not left with customers. (ECF No. 60 ¶¶ 70-76.) Defendants cite testimony suggesting that Defendants created their own checklists, procedures, and maintenance control program. (ECF No. 56 ¶ 136.) This testimony, however, is directly contradicted by testimony indicating that Tempest's documents are similar to Avanti's documents and are based on Avanti's documents, such that a question of fact exists as to this issue. (ECF No. 60 ¶¶ 136, 139, 369, 380.) Plaintiff also cites evidence indicating that Mr. Shattell had the Training Syllabus in his possession while working at Tempest. (Id. ¶ 359.) Finally, there is evidence to support a finding that both Ms. Cuenin and Mr. Smith worked on creating Tempest's documents, and evidence in the record would permit a reasonable jury to conclude that they relied on Avanti's documents when creating Tempest's documents. (Id. ¶¶ 141, 194, 367-68.)

### c. Customer List and Information

Facts in the record would also permit a reasonable jury to conclude that Defendants misappropriated Avanti's Customer List and customer information. Mr. Shattell had access to Avanti's confidential information, including wind site manager names and contact information, during his employment with Avanti, and prior to working for Avanti, he did not know the representatives of Avanti's customers. (Id. ¶ 148.) Mr. Shattell sent an email from his Avanti email address to his personal address that included the Customer List as an attachment on November 26, 2012. (ECF No. 56 ¶ 51.) Mr. Shattell could have asked someone in the office for the customer contact information if he had needed it, without having to send the document to

his personal email address. (ECF No. 60 (Pl. SMF) ¶ 25.) While Defendants cite testimony indicating that Mr. Shattell believed the list of supervisors was outdated, and did not believe this information was confidential, there is contradictory evidence in the record. (ECF No. 56 ¶¶ 54-55.) Mr. Shattell testified that he was aware when he left Avanti that he was not to retain any of its confidential information, and also testified that had he had received the Avanti handbook which indicated that its customer list was confidential, and that had he been asked, he would not have emailed the customer list to a competitor. (ECF No. 60 ¶¶ 118, 132-33.)

Although Defendants cite facts indicating that Mr. Shattell retained contact information only for close friends after leaving Avanti, Plaintiff cites contradictory evidence which calls into question the closeness of Mr. Shattell's relationships with these individuals, and which suggests that he instead retained this information for the purpose of contacting these individuals for a business purpose. (ECF No. 56 ¶ 157; ECF No. 60 ¶ 157.)

Mr. Shattell gave Ms. Cuenin information he referred to in an email to Ms. Cuenin as "inside information" about Avanti's customer base, including the contact information for several potential customers as early as December of 2012, before leaving his employment with Avanti. (ECF No. 60 ¶ 273; ECF No. 60 (Pl. SMF) ¶ 21.) The parties dispute whether Mr. Shattell meant the reference to "inside information" as a joke, but this is a question of credibility that must be reserved for the trier of fact at trial. Mr. Shattell personally solicited some customers that he dealt with while he was employed at Avanti (ECF No. 60 ¶ 171, 173), and Mr. Shattell gave to Ms. Cuenin the name of wind farm contacts, at least two of which became Tempest's customers. (Id. ¶¶ 117, 238.)

Prior to Mr. Shattell joining Tempest, Ms. Cuenin had not obtained a single client ([ECF No. 60 (Pl. SMF) ¶ 31](#)), and all of Tempest's customers appear on Avanti's customer list. ([ECF No. 60 ¶¶ 78-79, 82-83, 156](#).) These facts would permit a reasonable jury to conclude that Defendants misappropriated Avanti's customer list and customer information.

As the facts described above demonstrate, the record regarding Count One of the complaint, for misappropriation of trade secrets, is decidedly contradictory at each stage of the analysis and as to each category of information that Plaintiff claims as a trade secret.

The Court therefore denies Defendants' motion for summary judgment as to Count One of the Complaint. *See Scientific Image Center Management, LLC v. Brandy*, 415 F.Supp.2d 566, 570 (W.D. Pa. 2006) (denying summary judgment when fact issues existed as to whether, under Pennsylvania law, the proprietary information at issue constituted a trade secret, whether the plaintiff's proprietary information is valuable and confidential, and whether defendants misappropriated that information); *Prudential Ins. Co.*, 994 F.Supp. at 324 (denying defendant's motion for summary judgment on misappropriation of trade secrets claim where there were questions of fact as to whether the proprietary information, including client files, constituted a trade secret, and as to whether the information was protected once disseminated to defendant).

### B. Plaintiff's Common Law Claims

In the alternative to its claim for misappropriation of trade secrets, Plaintiff also asserts claims for unfair competition, unjust enrichment, interference with business relationship, and conversion against Defendants under the common law of Pennsylvania. ([ECF No. 1-2 ¶¶49-58, 66-83](#).) In Defendants' motion for summary judgment and brief in support of that motion, Defendants argue that each of the common law claims must be dismissed, because, they argue,

these claims are without merit and are preempted by the PUTSA. (ECF No. 55 ¶ 6; ECF No. 54 at 27-29). In response to Defendants' motion, Plaintiff argues that Defendants' preemption argument is misplaced, because Plaintiff properly pleaded the common law claims in the alternative to its claims under the PUTSA.

On November 9, 2015, Defendants filed a Motion for Leave to File a Reply Brief in Support of the Motion for Summary Judgment, which the Court granted on November 10, 2015. (*See* ECF Nos. 62, 63.) In Defendants' reply brief, they raise several additional arguments as to why Plaintiff "failed to set forth facts that establish a prima facie case for its common law claims" on the merits. (ECF No. 62-2 at 6.) On November 13, 2015, Plaintiff filed a Motion to Strike portions of Defendants' reply brief, which Defendants opposed. (ECF Nos. 64, 65.) In the motion to strike, Plaintiff argued that Defendants' reply brief improperly presented legal issues not previously raised or addressed by Defendants in their original brief in support of the motion for summary judgment. (ECF No. 64 ¶ 3.)

With regard to Defendants' preemption argument, the Court agrees with Plaintiff, and holds that it would be inappropriate to dismiss Plaintiff's common law claims at the summary judgment stage, because Plaintiff properly pleaded these claims in the alternative to its claim for misappropriation of trade secrets under the PUTSA. *See PNC Mortg.*, 2012 WL 25276, at *15 ("Tort claims that may or may not be preempted by the PUTSA are not dismissed at the summary judgment stage. Instead, the question of whether certain tort claims are preempted comes only after the jury has determined whether Defendants are liable for misappropriation of trade secrets.") (citing *Bro-Tech Corp.*, 651 F.Supp.2d at 412 (denying summary judgment on PUTSA claim and noting that tort claims predicated on misappropriation of trade secrets may

be preempted if and when the defendants were found at trial to have misappropriated trade secret information)).

As to the substance of Plaintiff's common law claims, the Court need not decide the issue of whether Defendants improperly raised new arguments for the first time in the reply brief, because the Court finds in the record ample questions of fact precluding summary judgment as to each of Plaintiff's common law claims, the substance of which are discussed more fully below. The motion to strike is therefore denied as moot.

### 1.    Unfair Competition

Defendants seek summary judgment on Plaintiff's claim for unfair competition under Pennsylvania's common law.

Under Pennsylvania law, unfair competition is generally defined as the "passing off" of a competitor's goods as one's own, thereby causing confusion between the defendant's goods and the competitor's goods. *Giordano v. Claudio*, 714 F.Supp.2d 508, 521 (E.D. Pa. 2010) (citing *Scanvec Amiable Ltd. v. Chang*, 80 Fed.Appx. 171, 180 (3d Cir. 2003)). Pennsylvania courts have also recognized, however, that the common law tort of unfair competition may apply "'where there is evidence of, among other things, . . . tortious interference with contract, improper inducement of another's employees, and unlawful use of confidential information.'" *CentiMark Corp. v. Jacobsen*, 2011 WL 5977668, at *16 (W.D. Pa. Nov. 29, 2011) (quoting *Synthes (U.S.A.) v. Globus Med, Inc.*, Civ. A. No. 04-1235, 2005 WL 2233441, at *8 (E.D. Pa. Sept. 14, 2005)). Further, Pennsylvania courts have recognized that "the Pennsylvania common law tort of unfair competition is coextensive with the definition set forth in the Restatement (Third) of Unfair Competition." (*Giordano*, 714 F.Supp.2d at 521-22 (citing cases)). Section One of the Restatement

provides that "[a]s a general matter, if the means of competition are otherwise tortious with respect to the injured party, they will also ordinarily constitute an unfair method of competition" *Id* (quoting Restatement (Third) of Unfair Competition § 1 cmt. g).

Defendants argue that they are entitled to summary judgment on Plaintiff's claim for unfair competition, because "Plaintiff has not offered any evidence that Shattell or Tempest engaged in any wrongful conduct." (ECF No. 62-2 at 6.) Specifically, Defendants state that because "Avanti cannot show that Defendants misappropriated any information . . . [or] that Shattell or Tempest has made any false statement with respect to Avanti to its customers," they are entitled to judgment as a matter of law on this claim. (*Id.*)

As discussed at length above, however, the Court finds that there are multiple questions of fact surrounding the wrongfulness of Defendants' conduct and whether Defendants misappropriated confidential information from Plaintiff. Evidence in the record indicates that Mr. Shattell sent pricing information, which he testified that he knew was confidential information, to his personal email address, and there is a dispute of fact as to whether he then used this information to inform Tempest about how to price its services. (*See* ECF No. 56 ¶¶ 53, 61-65, 248, 385, 388; ECF No. 60 ¶¶ 82-83, 156, 175-76, 184-85, 248, 251-53, 268, 348, 356, 367-68, 370, 373, 386; ECF No. 60 (Pl. SMF) ¶¶ 38, 53.)

In addition to pricing information, the record also supplies facts which indicate that Mr. Shattell sent an email to his personal email address that included Plaintiff's Work Method Statement. While Mr. Shattell testified that this document was not confidential and that he did not use the document while working at Tempest, his testimony is disputed by other facts in the record which indicate that these documents were confidential and that Mr. Shattell used them

to help create Tempest's own documents. (*See* ECF No. 56 ¶¶ 66-67, 70-76, 136; ECF No. 60 ¶¶ 70-76, 136, 139, 141, 194, 359, 367-69, 380; ECF No. 60 (Pl. SMF) ¶ 23.)

Lastly, there is a dispute as to whether Defendants misappropriated Plaintiff's Customer List and information. There are, for example, facts indicating that Mr. Shattell gave Ms. Cuenin "inside information" about Plaintiff's customer base, and that Mr. Shattell sent an email to his personal email address that included a document called "Lift locations and Contacts.xlsx." Moreover, the record indicates that all of Tempest's customers appeared on the List that Mr. Shattell sent to his personal email address, and that prior to Mr. Shattell leaving Avanti and joining Tempest, Tempest had not obtained a single client. (*See* ECF No. 56 ¶¶ 51, 54-55, 157; ECF No. 60 ¶¶ 78-79, 82-83, 117-18, 132-33, 148, 156-57, 171, 173, 238, 273; ECF No. 60 (Pl. SMF) ¶¶ 21, 25, 31.)

The facts listed in this section and discussed in more detail above would permit a reasonable jury to conclude that Defendants engaged in "wrongful conduct" and are therefore liable for unfair competition under Pennsylvania law. The Court thus concludes that genuine issues of material fact preclude summary judgment on Plaintiff's claim for unfair competition. The Court will therefore deny Defendants' motion for summary judgment as to Plaintiff's claim for unfair competition. *See Elsevier, Inc. v. Comprehensive Microfilm & Scanning Services, Inc.*, 2013 WL 1497946, at *12 (M.D. Pa. April 10, 2013) (denying the defendants' motion for summary judgment on unfair competition claim where granting the motion would have required the Court to make findings of fact, and holding that the issue was better reserved for trial).

### 2.    Unjust Enrichment

Plaintiff asserted a claim for unjust enrichment against Defendant Tempest. Tempest moves for summary judgment on this claim. (ECF No. 62-2 at 11.)

An unjust enrichment claim under Pennsylvania law requires a showing that (1) "the plaintiff conferred a benefit upon the defendant"; (2) "the defendant was aware of the benefit"; and (3) "the defendant's acceptance of the benefit occurred under circumstances in which it would be inequitable for [it] to retain the benefit without payment of the value thereof." *York Group, Inc. v. Pontone*, 2014 WL 896632, at *20 (W.D. Pa. March 6, 2014) (citing *Fabral, Inc. v. B&B Roofing Co., Inc.*, 773 F.Supp.2d 539, 549 n. 10 (E.D. Pa. 2011) (internal quotations omitted)). "Section 43 of the Restatement (Third) of Restitution and Unjust Enrichment renders '[a] person who obtains a benefit . . . in breach of a fiduciary duty . . . or . . . in consequence of another's breach of such a duty . . . liable in restitution to the person to whom the duty is owed.'" *York Group*, 2014 WL 896632, at *20 (quoting Restatement (Third) of Restitution and Unjust Enrichment § 43(a), (c) (2011) (noting that the Court had already predicted that § 43 would be adopted and applied by the Pennsylvania Supreme Court)). Under Pennsylvania law, an employee is an agent of his employer, and therefore owes to his employer a duty of loyalty. *Crown Coal & Coke Co. v. Compass Point Resources, LLC*, 2009 WL 891869, at *5 (W.D. Pa. March 31, 2009) (citing *Reading Radio, Inc. v. Fink*, 833 A.2d 199, 211 (Pa.Super.Ct. 2003)).

Tempest argues that the Court should grant the motion for summary judgment on Plaintiff's claim for unjust enrichment, because "Avanti cannot show any connection between use of any information and any 'benefit' received by Tempest." (ECF No. 62-2 at 11.) More specifically, Tempest argues that "Shattell did not access any customer lists after leaving Avanti

. . . [and] used his personal contacts with friends in the industry, some who happened to be Avanti customers." (*Id*. at 11-12.) In support of these arguments, however, Tempest cites Mr. Shattell's uncorroborated testimony. (*Id*.)

As the Court explained above, these facts are contradicted by others in the record. For example, deposition testimony indicates that Mr. Shattell gave Ms. Cuenin information that he referred to as "inside information" about Plaintiff's customer base, including the contact information for potential customers before leaving his employment with Plaintiff. (ECF No. 60 ¶ 273; ECF No. 60 (Pl. SMF) ¶ 21.) Moreover, Plaintiff cites evidence which suggests that Mr. Shattell retained customer information to contact these individuals for a business purpose. (ECF No. 56 ¶ 157; ECF No. 60 ¶ 157.) There is also evidence that all of Tempest's customers appear on Plaintiff's customer list, which Mr. Shattell emailed to his personal email address despite having received the Avanti handbook which indicated that customer lists were confidential, and that Mr. Shattell gave to Ms. Cuenin the name of wind farm contacts. (ECF No. 60 ¶¶ 78-79, 82-83, 117-18, 132-33, 156, 238.) Lastly, the record indicates that prior to Mr. Shattell joining Tempest, Ms. Cuenin had not obtained a single client. (ECF No. 60 (Pl. SMF) ¶ 31.) These facts contradict Mr. Shattell's statements, and would permit a reasonable jury to conclude that Mr. Shattell used Avanti's confidential information while employed at Tempest for Tempest's benefit.

Defendants also cite the testimony and statements of David Smith to support their argument that Mr. Shattell did not access training materials or documents with pricing information while employed at Tempest. (ECF No. 62-2 at 12.) Specifically, Plaintiffs argue that Tempest's documents were drafted by David Smith, "who never worked for Avanti and had no

access to any Avanti information that was not publicly available, using his many years of experience in the elevator industry." (*Id.*)

Again, however, the Court finds that these assertions are plainly contradicted by other facts in the record such that a genuine issue of material fact exists on this point. Plaintiff cites testimony describing the similarities between Plaintiff's training materials and Tempest's documents, and there is evidence that Mr. Shattell had the Avanti Training Syllabus in his possession while working at Tempest. (ECF No. 60 ¶¶ 136, 139, 359, 369, 380.) There is also evidence to support a finding that Ms. Cuenin assisted in creating Tempest's documents, and that she and Mr. Smith relied on Plaintiff's documents while creating Tempest's documents. (*Id.* ¶¶ 141, 194, 367-68.) As described at length above, there is evidence to support a finding that Mr. Shattell used his knowledge of Plaintiff's pricing information to inform Tempest's pricing and to form competitive proposals to send to prospective customers while at Tempest. (ECF No.56 ¶ 248; ECF No. 60 ¶¶ 82-83, 156, 175-76, 184-85, 248, 251-53, 268, 348, 367-68, 370; ECF No. 60 (Pl. SMF) ¶ 38.)

The Court concludes that genuine questions of fact preclude summary judgment on Plaintiff's claim for unjust enrichment against Tempest. Adopting Defendants argument on this claim would require the Court to make multiple credibility assessments. Such an exercise is inappropriate at the summary judgment stage, and such issues must be left to the trier of fact.

The Court therefore denies Defendant Tempest's motion for summary judgment on Plaintiff's claim for unjust enrichment. *See In re Antiq Sales and Marketing Practices Litig.*, 790 F.Supp.2d 313, 330-31 (E.D. Pa. 2011) (denying the defendant's motion for summary judgment on Plaintiffs' unjust enrichment claim where the plaintiffs had set forth sufficient evidence such

that summary judgment as a matter of law would have been inappropriate, and noting that the benefit conferred need not be the result of a direct relationship between the parties in order to fulfill such element of unjust enrichment).

### 3.    Interference with Business Relationship

Defendants seek summary judgment on Plaintiff's claim for interference with business relationship. To succeed on a claim for interference with business relationship under Pennsylvania law, the party must demonstrate: "(1) the existence of a contractual, or prospective contractual relation between itself and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent the prospective relation from occurring; (3) the absence of a privilege or justification on the part of the defendant; (4) the occasioning of actual legal damage as a result of the defendants' conduct; and (5) for prospective contracts, a reasonable likelihood that the relationship would have occurred but for the interference of the defendant." *Pilot Air Freight Corp. v. Sandair, Inc.*, 118 F.Supp.2d 557, 562-63 (E.D. Pa. 2000) (citing *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 529 (3d Cir. 1998) (applying Pennsylvania law and citing Pennsylvania Supreme Court cases)).

The Court concludes that genuine issues of fact preclude summary judgment on Plaintiff's claim for interference with business relationship. Defendants argue that they are entitled to summary judgment on this claim, citing the fact that Avanti does not have contracts with its customers but rather negotiates purchase orders. (ECF No. 62-2 at 8.) Defendants argue that Plaintiff has failed to identify facts in support of its claim that Tempest purposely interfered with its relationships by undercutting it on price using Avanti's confidential pricing

information. The Court finds, however, that Defendants have failed to establish that no material questions of fact exist as to the elements for a claim for interference with a business relationship under Pennsylvania law.

As discussed at length above, Plaintiff has provided evidence sufficient to raise a material fact as to whether Defendants misappropriated Plaintiff's pricing information. There are also facts in the record to indicate that Defendants sent proposals to potential customers which indicated Defendants' awareness of Plaintiff's pricing information, and intention to undercut Plaintiff on price. (*See* ECF No. 60 ¶¶ 175-76, 185.)

Specifically, Plaintiff cites evidence that Defendants submitted a proposal to perform maintenance and annual certifications for Iberdrola in 2014, and that Tempest intentionally undercut Avanti on price during the course of its discussions with Iberdrola. (*Id.* ¶¶ 78-79, 395). Plaintiff also cites evidence that when Mr. Shattell quit his job at Avanti and began working for Tempest in April of 2013, he began soliciting the same customers he had serviced with Avanti and offered the same services that Avanti was providing to those customers. (ECF No. 60 (Pl. SMF) ¶¶ 32-33.) The Co-Op Proposal that Mr. Shattell prepared and presented to five of Avanti's customers was followed by commitments from those customers to switch from Avanti to Tempest. (*Id.* ¶ 35.) Mr. Shattell also sent a proposal to service the entire fleet of Iberdrola, one of Avanti's largest customers. (*Id.* ¶ 42.) This evidence is sufficient to raise multiple questions of material fact as to the viability of Plaintiff's claim for interference with business relationship. Based on the facts described in this section, a reasonable jury could conclude that Avanti had prospective contractual relationships that were reasonably likely to occur with

multiple customers for which it had done work in the past and that Defendants intentionally interfered with these prospective relationships and prevented them from occurring.

The Court therefore denies Defendants' motion for summary judgment on Plaintiff's claim for interference with business relationship. *See Pilot Air*, 118 F.Supp.2d at 563 (denying cross motions for summary judgment where the parties' arguments rested on a credibility analysis and where neither party had shown that no genuine issue of material fact existed with respect to the first element of the claim for wrongful interference with a contract).

### 4. Conversion

Under Pennsylvania law, conversion is (1) the deprivation of another's right in, or use or possession of, property, (2) without the owner's consent, and (3) without lawful justification. *Crown Coal*, 2009 WL 891869, at *8 (citing *Universal Premium Acceptance Corp. v. York Bank & Trust Co.*, 69 F.3d 695, 704 (3d Cir. 1995)). *See also Norriton East Realty Corp v. Central—Penn National Bank*, 435 Pa. 57, 60, 524 A.2d 637, 638 (1969); *Eisenhauer v. Clock Towers Assocs.*, 399 Pa.Super. 238, 582 A.2d 33, 36 (1990).

Conversion can be committed in a variety of ways, including (1) acquiring possession of the chattel with the intent to assert a right to it which is adverse to the owner; (2) transferring the chattel and thereby depriving the owner of control; (3) unreasonably withholding possession of the chattel from one who has the right to it; or (4) misusing or seriously damaging the chattel in defiance of the owner's rights. *Fort Washington Resources, Inc. v. Tannen*, 846 F.Supp. 354, 361 (E.D. Pa. 1994) (citing *Norriton*, 435 Pa. at 61). If the defendant lawfully came into possession of the chattel, conversion may still occur if demand for the chattel is made by the rightful owner and the party refuses to deliver. *Id.*

Defendants argue that they are entitled to summary judgment on Plaintiff's claim for conversion. Defendants argue first that the information that Plaintiff alleges was converted was not confidential information. (ECF No. 62-2 at 10.) Defendants also argue that even if the information could be considered confidential, Defendants did not use the information for the benefit of Tempest. (*Id.*) Defendants argue that Tempest based its pricing upon the going rate for unionized elevator inspectors. (*Id.* at 10-11.) Lastly, Defendants argue that Mr. Shattell did not acquire information through misconduct, but rather acquired documents rightfully as an employee of Plaintiff. (*Id.* at 11.)

The Court finds that Defendants have failed to establish that there are no issues of material facts as to Plaintiff's claim for conversion. As discussed at length above, Plaintiffs have set forth numerous facts sufficient to survive summary judgment on the questions of whether Plaintiff's Customer List, training materials, pricing information, and other claimed trade secrets were confidential, whether Defendants used that information to inform its own pricing and to gain customers, and whether Mr. Shattell acted wrongfully in taking the relevant information. As noted before, these are issues of material fact that must be resolved by a jury. The Court thus finds that issues of fact preclude summary judgment on Plaintiff's claim for conversion.

Accordingly, Defendants' motion for summary judgment is denied as to Plaintiff's claim for conversion. *See Crown Coal*, 2009 WL 891869, at *8 (W.D. Pa. March 31, 2009) (finding multiple disputes of material fact as to the elements of conversion and therefore denying the defendants' motion for summary judgment as to that claim).

### C.    Plaintiff's Request for Injunctive Relief

Plaintiffs assert a claim for injunctive relief. (ECF No. 1-2 ¶¶ 59-65.) Defendants move for summary judgment on this claim.

To be entitled to an injunction against the use or disclosure of trade secrets or confidential information under Pennsylvania law, a plaintiff must show: (1) the information constitutes a trade secret; (2) the information was of value to the employer and important in the conduct of his business; (3) by reason of discovery or ownership, the employer had the right to use and enjoyment of the secret; and (4) the secret was communicated to the defendant while employed in a position of trust and confidence under such circumstances as to make it inequitable and unjust for him to disclose it to others, or to make use of it himself, to the prejudice of his employer. *Prudential Ins. Co.*, 994 F.Supp. at 323 (citing *SI Handling Systems*, 753 F.2d at 1255; *Felmlee v. Lockett*, 466 PA. 1, 351 A.2d 273, 277 (1976); *Mettler-Toledo, Inc. v. Acker*, 908 F.Supp. 240, 246 (M.D. Pa. 1995)).

In support of the motion for summary judgment, Defendants argue that the Court should grant summary judgement in their favor on Plaintiff's claim for injunctive relief, asserting that Plaintiff cannot succeed on the merits of its claims. (ECF No. 54 at 24-25.)

In response to Defendants' motion, Plaintiff argues that "there are more than adequate facts to demonstrate that Avanti can and will succeed" on its claims, and because Defendants' request for summary judgment ignores the inevitable disclosure doctrine, which would enjoin an employee like Mr. Shattell from accepting employment with a competitor when the new employment would necessarily result in the disclosure of trade secrets. (ECF No. 59 at 17-19.)

In their reply brief, Defendants concede that there "may be instances where the [inevitable disclosure] may allow injunctive relief where a former employee would necessarily use trade secrets in the former employee's current employment with a competitor." (ECF No. 62-2 at 12.) Defendants argue, however, that because Mr. Shattell no longer works for Tempest, and because "Avanti has set forth no facts that show that [Mr.] Shattell is likely to work for Tempest or any other competitor and thus likely to disclose any alleged trade secrets," Plaintiff is not entitled to injunctive relief as a matter of law. (*Id*. at 12-13.)

As discussed above at length, the Court has concluded that there are numerous issues of material fact precluding summary judgment on each of Plaintiff's claims. These same facts preclude summary judgment on the issue of injunctive relief, regardless of whether Mr. Shattell still works for Tempest. Plaintiff has provided the Court with sufficient evidence to support this conclusion, including, for example, disputes of material fact as to whether Mr. Shattell misappropriated Plaintiff's trade secrets, whether Tempest's business was founded using Plaintiff's trade secrets, and the amount of overlap between Tempest's business and Avanti's business. These material questions of fact must be presented to a jury and decided before the Court can reach a decision on whether injunctive relief is appropriate in this case. Defendants' motion for summary judgment on Plaintiff's claim for injunctive relief is therefore denied.

## VI. Conclusion

For the reasons stated above, the motion for summary judgment filed by Defendants is denied. An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **AVANTI WIND SYSTEMS, INC.,** | ) |
| | ) **CIVIL ACTION NO. 3:14-98** |
| **Plaintiff,** | ) |
| | ) **JUDGE KIM R. GIBSON** |
| **v.** | ) |
| | ) |
| **ROBERT N. SHATTELL and THE** | ) |
| **TEMPEST GROUP, INC.,** | ) |
| | ) |
| **Defendants.** | ) |

## ORDER

AND NOW, this $9th$ day of June, 2016, upon consideration of Defendants' Motion

for Summary Judgment (ECF No. 55) and upon consideration of Plaintiff's Motion to Strike

Portions of Defendants' Reply Brief in Support of Motion for Summary Judgment (ECF No. 64),

and the Court having been fully briefed on these matters, and in accordance with the foregoing

Memorandum Opinion, **IT IS HEREBY ORDERED** that the Motion for Summary Judgment

(ECF No. 55) is **DENIED** and **IT IS FURTHER ORDERED** that the Motion to Strike (ECF No.

64) is **DENIED AS MOOT**.

**BY THE COURT:**

**KIM R. GIBSON**
**UNITED STATES DISTRICT JUDGE**